```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
E. Z.-L., by her parents R.L. and A.Z.,                     :
                                                            :
                              Plaintiffs,                   :   09 Civ. 8998 (SHS)
                                                            :
              -against-                                     :   OPINION & ORDER
                                                            :
NEW YORK CITY DEPARTMENT OF                                 :
EDUCATION,                                                  :
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------x
```

SIDNEY H. STEIN, U.S. District Judge.

      Plaintiffs R.L. and A.Z. bring this action on behalf of their minor child E. Z.-L. pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. § 1400, *et seq.* ("IDEA").  In March of 2009, Impartial Hearing Officer ("IHO") Gary D. Peters awarded plaintiffs full reimbursement for Z.-L.'s placement at the Rebecca School for the 2008-2009 school year and for after-school therapy services.  However, three months later, State Review Officer ("SRO") Paul F. Kelly reversed that determination and found that no reimbursement was appropriate.  Plaintiffs now seek review of that determination and defendant New York City Department of Education ("DOE" or "the school district") also seeks review of the SRO's decision to the extent that he denied the DOE's request to recoup payments it had advanced to plaintiffs for Z.-L.'s tuition and therapy services during the pendency of these proceedings.  Both parties now move for summary judgment.  For the reasons set forth below, the parents' motion is denied and the school district's motion is granted insofar as it seeks dismissal of the complaint and denied insofar as it requests recovery of the payments it has already made to plaintiffs.

## I. STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B). States receiving federal funding under the IDEA are required to provide a free appropriate public education ("FAPE") to all children with disabilities. *Id.* § 1412(a)(1)(A). To this end, the IDEA requires that the relevant local or state educational agency create an individualized education program ("IEP") at least annually for each disabled student. *Id.* § 1414(d)(2)(A).

In New York City, a Committee on Special Education ("CSE") develops each student's IEP. N.Y. Educ. L. § 4402(b). Parents are "members" of the CSE that formulates their child's IEP, *id.*, and the IDEA requires that they be provided an opportunity to present complaints with respect to the identification, evaluation, or placement of their child during the IEP process. 20 U.S.C. § 1415(b)(6)(A). Where parents believe that the school district has not adequately responded to their complaints, they may pursue their grievances through an "impartial due process hearing." *Id.* § 1415(f)(1)(A). In New York, an IHO conducts these hearings, and parties who disagree with the IHO's decision may appeal to the SRO. *See* N.Y. Educ. L. § 4404; 20 U.S.C. § 1415(g)(1). The SRO's decision, in turn, may be challenged in either state or federal court. 20 U.S.C. § 1415(i)(2)(A). The district court shall "receive the records of the administrative proceedings," "hear additional evidence," and "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it. *Id.* § 1415(i)(2)(C).

## II. FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

### A. Z.-L.'s Educational History

Z.-L., now nine years old, has been classified by the DOE as "autistic" (Compl. ¶ 1), and is thus a "child with a disability" under the IDEA. *See* 20 U.S.C. § 1401(3)(A)(i). In September 2005, Z.-L. began attending preschool and receiving occupational and speech-language therapy. (Administrative Record, Parents Exhibit JJ at 15.)[1]  Z.-L. has been attending the Rebecca School, a private day school in Manhattan for students with "autism and other developmental disabilities," since September 2006. (Compl. ¶ 11.)

In May 2007, the Committee on Special Education met to formulate Z.-L.'s educational program for the 2007-2008 school year. (Parents Ex. C at 3.) Following that meeting, the School District recommended a school, which the parents rejected. (*Id.*) The parents then requested an impartial hearing, alleging that the school district had failed to offer Z.-L. a FAPE for the 2007-2008 school year. (*Id.*) At the impartial hearing, the DOE conceded that it failed to offer a FAPE to the child, but maintained that the Rebecca School was not an appropriate placement and that the private therapy services Z.-L. was receiving were excessive. (*Id.* at 4.) In June 2008, IHO Susan K. Markus found that Z.-L.'s attendance at the Rebecca School plus 20 hours per week of "Floortime" therapy constituted an appropriate educational program. (*Id.* at 17.) The DOE did not appeal that decision.

### B. Development of the 2008-2009 IEP

The committee met again in April of 2008 to formulate the child's educational program for the 2008-2009 school year. The committee included Z.-L.'s mother, a special education teacher (who also acted as the District Representative), a school psychologist, a

---

[1] This Opinion will refer to plaintiffs' and defendant's exhibits in the administrative record as "Parents Ex." and "Sch. Dist. Ex.," respectively.

3

general education teacher, and Z.-L.'s teacher from the Rebecca School. The resulting IEP recommended that Z.-L. be placed in a special class with a 6:1:1 ratio (six disabled children for every teacher and teacher's aide) and set forth long and short-term goals for Z.-L. in the areas of speech-language, communication, social-emotional issues, problem solving, motor planning, sequencing, and academics. (*See* Sch. Dist. Ex. 1 ("2008-2009 IEP").) It also recommended that she receive the following services on a weekly basis: (1) four 30-minute sessions of individualized occupational therapy; (2) three 30-minute sessions of individualized speech-language therapy, (3) one 30-minute session of 3:1 speech-language therapy; (4) one 30-minute session of individualized counseling; and (5) one 30-minute session of 2:1 group counseling. (*Id.*)

Z.-L.'s parents then received a notice recommending that Z.-L. be placed in a specialized class with a 6:1:1 ratio at the Children's Workshop School, not the Rebecca School. (Sch. Dist. Ex. 2.) Z.-L.'s mother visited the proposed placement and, after observing several classes and meeting with an assistant principal, found it unsuitable for her child. (Impartial Hearing Transcript ("Tr.") at 240:22-254:4.) In a letter dated May 22, 2008, Z.-L.'s parents rejected the Children's Workshop School and advised the DOE that, in the absence of an appropriate placement, they intended to reenroll Z.-L. at the Rebecca School at the DOE's expense. (Parents Ex. MM.) They then requested an impartial hearing on the ground that the DOE had failed to offer Z.-L. a FAPE for the 2008-2009 school year. (Parents Ex. A.) They also requested reimbursement for Z.-L.'s Rebecca School transportation and tuition and for her after-school services—specifically, her participation in the "Throwback Sports" program, two hours per week of speech-language therapy, and 20 hours per week of "Floortime" therapy. (*Id.*, Parents Ex. HH.) Plaintiffs then reenrolled Z.-L. in the Rebecca School for the 2008-2009 school year. (Parents Ex. Z.)

4

C.  Proceedings before the IHO

When the impartial hearing commenced in July 2008, the parties stipulated that pursuant to the IDEA's "stay put" provision, *see* 20 U.S.C. § 1415(j), Z.-L. was entitled to continue receiving, at the DOE's expense, tuition and transportation costs at the Rebecca School and 20 hours of "Floortime" therapy during the pendency of the proceedings.[2]  (Tr. at 3:9-5:11.)  The impartial hearing then took place before IHO Peters between September 2008 and January 2009.

The DOE presented two witnesses who primarily discussed the CSE procedure and the educational programs and services offered at the Children's Workshop School.  Specifically, Feng Ye, a special education teacher for the DOE, testified about the CSE meeting that occurred on April 30, 2008.  Prior to that meeting, Ye stated that she had reviewed the following background material related to Z.-L.: a speech progress report, an occupational therapy progress report, a teacher report from the Rebecca School, observation reports, psychological reports, and Z.-L.'s previous IEP.  (*Id.* at 41:13-18.)  Ye explained that, after considering and rejecting a program placing Z.-L. in a community school with a 12:1:1 ratio, the CSE team ultimately recommended a "specialized class in a specialized school district" for Z.-L. with a recommended staffing ratio of 6:1:1.  (*Id.* at 43:11-21, 50:16-20.)  Ye stated that Z.-L.'s deficits at the time of the CSE meeting consisted of "academic delays," "d[y]sregulation,"[3] a need for "instant gratification," and "biting her hands or hitting herself."  (*Id.* at 45:16-23.)  According to Ye, the CSE team addressed these deficits by

---

[2] The next month IHO Peters issued an interim pendency order instructing the school district to "continue to pay for and fund" these expenses.  (Ex. A to Aff. of Gary Mayerson dated May 6, 2010 ("IHO Decision").)

[3] Tina McCourt, Program Director at the Rebecca School, stated that when Z.-L. becomes dysregulated she is "less available to be involved in the learning, to be able to focus" and is "distracted" and "self-absorbed."  (*Id.* at 123:11-15.)

5

"develop[ing] goals to reduce [her] undesirable behaviors," recommending counseling, and initiating a diet. (*Id.* at 46:1-3, 16-19.) Ye acknowledged that Z.-L. had made progress at the Rebecca School and opined that, relative to other children on the autism spectrum, she is "not that low functioning." (*Id.* at 93:8-94:3.)

Susan Cruz, an assistant principal at P.S. 94, testified at length about the educational opportunities and therapy services offered at the Children's Workshop School—the DOE's recommended placement for Z.-L. She explained that the school provides "[w]hatever is mandated on [a] student's IEP," including "speech, occupational therapy, physical therapy . . . and counseling." (*Id.* at 178:22-23, 179:23-180:3.) According to Cruz, the Children's Workshop School has the following services for students with sensory regulation issues: (1) an occupational therapist who prepares a sensory diet customized to each student's needs, and (2) a "sensory room," which has a "scent area," a "bubble center," a "construction area," and "an art area with different textures." (*Id.* at 193:20-194:18, 199:2-13.) Cruz testified that, in her opinion, Z.-L.'s IEP could have been implemented at the Children's Workshop School. (*Id.* at 196:10.)

Plaintiffs presented eight witnesses, including themselves and Z.-L.'s current teachers and service providers, who primarily discussed Z.-L.'s progress at the Rebecca School and the alleged deficiencies of the DOE's recommended program for Z.-L.

Tina McCourt, Program Director at the Rebecca School, discussed the developmental individual difference relationship ("DIR" or "Floortime") model, which is the "core methodology" at the Rebecca School. (*Id.* at 111:5-9, 117:23-24.) McCourt testified that Z.-L. required access to a "sensory gym"[4] due to her "sensory regulation issues" (*id.* at 122:15-

---

[4] McCourt testified that a "sensory gym" differs from a regular gym in that the former has (1) "padding on the walls and the floors," and (2) tools used in "sensory integration therapy" such as "suspended equipment, swings, balancing equipment, trampolines, weighted vests, chewy tubes, [and] Theraputty." (*Id.* at 120:15-20.)

6

25), and needs after-school services to help her "generalize"—or, in other words, to apply skills to different settings (*id.* at 130:6-22). McCourt stated that Z.-L. is in the "middle of the range" of functioning on the autism spectrum and that she has made "meaningful progress" at the Rebecca School and in her after-school therapy services. (*Id.* at 133:6-16, 137:6-19.)

Rebecca Starr, Z.-L.'s teacher at the Rebecca School and a participant at the CSE meeting, testified at length about the child's sensory needs, the therapy services she received, and the progress she had made at the Rebecca School. (*Id.* at 289:18-295:20.) Starr explained that she had shared Z.-L.'s progress reports with the CSE team, gave them input regarding what to include in Z.-L.'s IEP, that they listened to her "completely" regarding Z.-L.'s academic functioning levels, and that she essentially agreed with the CSE team's ultimate recommendations for the child. (*Id.* at 301:1-302:5, 316:14-22.)

Z.-L.'s parents both testified before the IHO that they believed the DOE had denied Z.-L. a FAPE. Z.-L.'s mother stated that the CSE team did not recommend a specific school for Z.-L. at the CSE meeting nor did anyone discuss parent training or the development of a transition plan. (*Id.* at 246:19-22, 249:14-19, 252:8-17.) She also described her visit to the Children's Workshop School. (*Id.* at 240:22-247:7.) Based on her visit, Z.-L.'s mother felt that the school was not appropriate for her child because it lacked a "sensory gym" and because of the high male-to-female student ratio in the classes she had observed. (*Id.* at 253:4-254:4, 273:15-16.)

Plaintiffs also presented testimony from the following service providers who worked with Z.-L: Audrey Scheveloff, an occupational therapist at the Rebecca School; Erica Levy, a speech and language therapist at the Rebecca School; Joseph Kennedy, a therapist who provides transportation and "Floortime" therapy to Z.-L.; and Michael Cohen, the creator of the Throwback Sports program. These witnesses discussed the type and frequency of services they provided to Z.-L., the extent of her academic, social, and behavioral deficits,

and the progress she had made using their respective services.

### D. The IHO's Decision

In his decision dated March 24, 2009, IHO Peters found that Z.-L. had been denied a FAPE because: (1) the DOE had failed to create a Functional Behavioral Assessment or a Behavior Intervention Plan for Z.-L.; (2) Z.-L.'s IEP did not include parent training and counseling; (3) the CSE team did not recommend a specific placement for Z.-L. at the CSE meeting; and (4) Z.-L.'s IEP did not include a "transition plan." (*See* IHO Decision at 30-32.) The IHO also found that the Rebecca School, "Floortime" and speech-language therapy, and Throwback Sports constituted an appropriate educational program for Z.-L. (*Id.* at 33-37.) Finally, the IHO directed the School District to reimburse plaintiffs for the cost of the child's Rebecca School tuition and transportation for the 2008-2009 school year and for her after-school therapy services. (*Id.* at 38-39.)

### E. Appeal to the SRO and SRO's Decision

The DOE appealed that determination to the SRO. By decision dated June 26, 2009, the SRO annulled the IHO's decision. After a lengthy discussion of the evidence at the hearing before the IHO, the SRO found that the DOE had in fact provided a FAPE to the child. (Ex. A to Decl. of Lesley Berson dated Mar. 31, 2010 ("SRO Decision").) Specifically, the SRO noted that the CSE team's decision not to develop a Functional Behavioral Assessment or a Behavior Intervention Plan was made after it had considered Z.-L.'s behavioral issues and ultimately concluded that her classroom teacher would be able to address them. (*Id.* at 13.) The SRO agreed with the IHO that Z.-L.'s IEP should have included a provision for parent training and counseling, but concluded that this defect was not fatal because the DOE's recommended placement "offered parent training that was consistent with" New York State regulations. (*Id.*) The SRO also found that the CSE team was not required to recommend a specific school for Z.-L. at the CSE meeting and that Z.-

L.'s parents were actively involved in the educational placement process. (*Id.* at 14-15.) Finally, the SRO concluded that the Children's Workshop School would have addressed Z.-L.'s "transition needs related to her enrollment at the school." (*Id.* at 16.)[5]

With respect to the school district's recommended special education program, the SRO determined that it was "reasonably calculated to confer educational benefits" to Z.-L. because the CSE team relied upon reports detailing Z.-L.'s deficit areas and received input from her Rebecca School teacher and parents in order to form "an accurate assessment of her functioning, academic level, and needs." (*Id.* at 17.) Additionally, the SRO determined that the CSE team had recommended appropriate related services on the child's IEP and set forth "goals and short-term objectives to develop [her] skills in her identified deficit areas." (*Id.*)

F. The Instant Action

Plaintiffs then commenced this action seeking (1) reversal of the SRO's June 26, 2009 decision, (2) reinstatement of the IHO's decision, (3) an order directing defendant to reimburse plaintiffs for Z.-L.'s tuition and costs at the Rebecca School and for her after-school therapy services during the 2008-2009 school year, and (4) an order granting plaintiffs leave to seek the costs of pursuing this litigation.

Apart from the administrative record, plaintiffs assert that the Court should consider several documents as "additional evidence" in this action pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii). In particular, plaintiffs submit three documents titled "Special Education Service Delivery Report," which indicate that P.S. 94 has not always delivered special education services to students who require them. (Exs. 6-8 to Mayerson Aff.) Simply put, these documents relate to P.S. 94, and therefore have minimal relevance, if any, to the provision of special education services at the Children's Workshop School (or P.S.

---

[5] The SRO also found that the school district provided a FAPE to Z.-L. despite the fact that the school district's proposed placement had a "sensory room" rather than a "sensory gym." (*Id.*) However, the Court does not address this issue because plaintiffs do not raise it on appeal.

9

361)—the School District's recommended placement for Z.-L.[6]  Plaintiffs also submit a stipulation agreed to by the DOE in the class action *Jose P. v. Ambach*, 669 F.2d 865 (2d Cir. 1982), and argue that although "Z.-L. was not even born" at the time the stipulation was entered into, she "certainly falls within its zone of protection going forward."  (Pls.' Mem. of Law at 22.)  However, as a general rule, "a consent decree can be enforced only by a party, a party's privy, or an intended beneficiary," *M.S. v. N.Y. City Dep't of Educ.*, 09 Civ. 5065, 2010 U.S. Dist. LEXIS 87682, at *21 (E.D.N.Y. Aug. 25, 2010) (citation omitted).  *Jose P.* involved the DOE's failure to timely evaluate and place children in special education programs, which is not at issue here.  *See Jose P.*, 669 F.2d at 867; *see also M.S.*, 2010 U.S. Dist. LEXIS 87682 at *21.  Thus, the Court does not consider the special education delivery reports or the *Jose P.* stipulation in determining whether the DOE provided a FAPE to Z.-L.

### III. DISCUSSION

#### A. Standard of Review

Although the parties have styled their submissions as motions for summary judgment, "the procedure [in IDEA actions] is in substance an appeal from an administrative determination, not a summary judgment." *Lillibask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation omitted).  Accordingly, summary judgment in IDEA actions "often triggers more than an inquiry into possible disputed facts." *Id.*  Rather, the court must conduct an "independent" review of the administrative record and base its decision on the "preponderance of evidence." *Bd. of Educ. v. Rowley*, 458 U.S. 176,

---

[6] The exact relationship between P.S. 94 and The Children's Workshop School is unclear from the record and both the parties and the administrative officers refer to the two interchangeably.  In her impartial hearing testimony, Cruz, an assistant principal at P.S. 94, refers to The Children's Workshop School as P.S. 361 and describes it as one of "our off sites."  (Tr. 178:20-23, 202:10-25.)   Suffice it to say that P.S. 94 and The Children's Workshop School are not identical.  *Compare* 2008-2009 Special Education Delivery Report for P.S. 94, at http://schools.nyc.gov/documents/teachandlearn/sesdr/2008-09/sesdr_M094.pdf, with 2008-2009 Special Education Delivery Report for Children's Workshop School, at http://schools.nyc.gov/documents/teachandlearn/sesdr/2008-09/sesdr_M361.pdf.

205 (1982) (citation omitted).  Summary judgment thus "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA." *Lillibask*, 397 F.3d at 83 n.3 (citation and internal quotation marks omitted).

However, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," *T.Y., K.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (citation omitted), *cert. denied*, 130 S. Ct. 3277 (2010), and "courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review'" *id.* (quoting *Rowley*, 458 U.S. at 206).  "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *T.Y.*, 584 F.3d at 417 (citation omitted).  Deference is particularly warranted where, as here, the SRO's review has been "thorough and careful."  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).  The district court should "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer."  *A.C. & M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (citation and internal quotation marks omitted).  Thus, where "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight."  *Id.* (citation and internal quotation marks omitted).[7]

---

[7] Plaintiffs argue for *de novo* review of the SRO's decision because they contend that the SRO is biased in favor of the DOE.  In support of this assertion, plaintiffs (1) allege that the SRO has a personal relationship with an attorney who works for the State Education Department, (2) submit a spreadsheet purporting to show how often the SRO's decisions were unfavorable to disabled children, and (3) submit a Wall Street Journal article that disparages the SRO and implies bias.  These documents and allegations are inadmissible or insufficient to show bias (or both), and have been uniformly rejected by courts in this district.  *See, e.g., C.G. & L.G. v. N.Y. City Dep't of Educ.*, 09 Civ. 6169, 2010 U.S. Dist LEXIS, at *12-14 (S.D.N.Y. Oct. 22, 2010), *W.T. v. Bd. of Educ. of the Sch. Dist. of N.Y. City*, 09 Civ. 1368, 2010 U.S. Dist. LEXIS 4135, at *29-34 (S.D.N.Y. Apr. 15, 2010); *Adrianne & Joshua D. v. Lakeland Cent. Sch. Dist.*, 686 F. Supp. 2d 36, 368 (S.D.N.Y. 2010); *M.N. & H.N. v. N.Y. City Dep't of Educ.*, 700 F. Supp. 2d 356, 364-65 (S.D.N.Y.

11

B. Tuition Reimbursement

When a state receiving federal funding for special education fails to give a disabled child a FAPE under the IDEA, the child's parents may unilaterally place the child in an appropriate private school and seek tuition reimbursement from the state. A three-step analysis is employed by the Court to determine whether Z.-L.'s parents are entitled to reimbursement. *See Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). First, the Court considers whether the DOE has complied with the IDEA's procedural requirements. Next, it asks whether the child's IEP is "reasonably calculated to enable [her] to receive educational benefits." *Id.* (citation omitted). Only if the child's IEP is procedurally or substantively deficient does the Court reach the third step and ask whether "the private schooling obtained by the parents is appropriate to the child's needs." *Id.* (citation and internal quotation marks omitted). If the Court finds that the private schooling is appropriate, "the district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citation omitted).

Here, plaintiffs contend that they are entitled to tuition reimbursement because, contrary to the SRO's findings, Z.-L. was denied a FAPE due to the DOE's failure to (1) include the parents in the placement recommendation process, (2) develop an FBA and BIP for the child, (3) provide for parent training and counseling in the child's IEP, and (4) create a transition plan for her.

### 1. *Compliance with IDEA's Procedural Requirements*

Procedural errors will render an IEP inadequate only where those errors (1) impeded the child's right to a FAPE, (2) significantly impeded the parents' opportunity to participate

---

2010); *M.M. & H.M. v. N.Y. City Dep't of Educ.*, 583 F. Supp. 2d 498, 503 (S.D.N.Y. 2008). Accordingly, this Court gives the SRO's decision the weight required by law. *See T.Y.*, 584 F.3d at 417.

12

in the decision making process regarding the provision of a FAPE, or (3) caused a deprivation of educational benefits. *See M.N. & H.N. v. N.Y. City Dep't of Educ.*, 700 F. Supp. 2d 356, 364-65 (S.D.N.Y. 2010) (citing 20 U.S.C. § 1415(f)(3)(E)(ii)).

    a. Parent Participation

The parents contend that the DOE did not include them in the placement recommendation process in violation of the IDEA's requirement that the "parents of each child with a disability [must be] members of any group that makes decisions on the educational placement of their child." *See* 20 U.S.C. § 1414(e). However, a child's "educational placement" refers only to the "general educational program—such as the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school." *T.Y.*, 584 F.3d at 419. Thus, while a school district is required to ensure that parents have the opportunity to participate in formulating their child's general educational program, it is not required to involve them in its decision regarding the specific placement recommendation for the child.

Here, as the SRO found, the record reflects that plaintiffs were actively involved in the educational placement decisions relating to Z.-L. Indeed, Z.-L.'s mother attended the CSE meeting at which Z.-L.'s IEP was formulated, received notice of the school district's proposed placement well in advance of the start of the school year, and visited the proposed placement. Moreover, Z.-L.'s mother testified that during the CSE meeting she requested that her child receive additional speech therapy and counseling and that these requests were honored in the ultimate IEP. (Tr. at 252:1-4, 270:7-14.) The Court thus agrees with the SRO's finding that the parents actively participated in educational placement decisions pertaining to Z.-L. and therefore identifies no error, much less one capable of denying Z.-L. a FAPE. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 253 (2d Cir. 2009) (identifying no IDEA violation where parents "meaningfully participated" in

development of IEP); *see also Cerra,* 427 F.3d at 193 (identifying no violation where parents had "numerous opportunities to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (internal quotation marks omitted)).

> b. Development of Functional Behavioral Assessment and Behavior Intervention Plan

Plaintiffs assert that the SRO erred in finding that the school district was not required to develop a Functional Behavioral Analysis ("FBA") and Behavior Intervention Plan ("BIP") for Z.-L. The IDEA requires that, in developing an IEP for "a child whose behavior impedes [his or her] learning," the school district must "consider the use of positive behavioral interventions . . . to address that behavior.'" 20 U.S.C. § 1414(d)(3)(B)(i); *see also A.C.*, 553 F.3d at 172. This mandate is often carried out through the development of an FBA, which provides detailed information about a student's problem behaviors, and a BIP, which provides strategies to reduce those behaviors. *See* N.Y. Comp. Codes R. & Regs. Tit. 8, § 200.22(a)-(b).

Here, the SRO credited the testimony of Ye, a special education teacher for the school district, who stated that the CSE team considered whether to develop a BIP for Z.-L., but determined that it was unnecessary because Starr, Z.-L.'s teacher at the Rebecca School, had indicated at the CSE meeting that the classroom teacher would be able to address Z.-L.'s behavior sufficiently. (Tr. 46:20-47:1, 98:1-25.) During her testimony, Starr confirmed that Z.-L.'s sensory issues needed to be addressed, not her behavior, and opined that Z.-L. did not need a BIP as long as she received her sensory diet. (*Id.* at 312:6-22.) The CSE team's determination that Z.-L.'s behavior did not require an FBA or BIP is also reflected in Z.-L.'s IEP, which states that she exhibits "some amount of emotional or sensory dysregulation and demonstrates biting of her hand or hitting herself," but that such behavior "does not seriously interfere with instruction" and "[c]an be addressed by [a] special education teacher." (2008-

2009 IEP at 4.) Even assuming that Z.-L.'s behaviors do interfere with her learning, the record reflects that the CSE team developed strategies such as counseling, initiating a sensory diet, and developing "goals for [her] academic and social/emotional improvement" to address those behaviors (Tr. at 46:1-3, 16-19; 2008-2009 IEP at 4). *See M.N. & H.N.*, 700 F. Supp. 2d at 366 ("[F]ailure to conduct an FBA does not render an IEP procedurally inadequate where the IEP provides strategies to address the student's behavior."); *see also A.C.*, 553 F.3d at 172-73; *M.H. & E.K. v. N.Y. City Dep't of Educ.*, 712 F. Supp. 2d 125, 159 (S.D.N.Y. 2010).

Thus, the Court sees no reason to disturb the SRO's finding that the DOE's decision not to develop an FBA or BIP for Z.-L. "did not rise to the level of a denial of a FAPE." (SRO Decision at 13.)

### 2. *Substantive Adequacy of the IEP*

A school district complies with the IDEA's substantive requirements if a student's IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. "A school district is not, however, required to furnish every special service necessary to maximize each handicapped child's potential." *Cerra*, 427 F.3d at 195 (internal quotation marks omitted) (citing *Rowley*, 458 U.S. at 199). As such, a school district fulfills its substantive obligations under the IDEA "if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (citation and internal quotation marks omitted). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Id.*

a. Parent Training and Counseling

New York regulations require that school districts offer training and counseling to parents of a child with autism in order to help the parents implement their child's IEP. *See* N.Y. Comp. Codes R. & Regs. Tit. 8, § 200.13(d). Although Z.-L.'s IEP did not provide parent training or counseling, the SRO found that the DOE's recommended placement offered parent training opportunities consistent with New York regulations. (SRO Decision at 13.) The SRO's finding is supported by Cruz's testimony, which established that the Children's Workshop School brings in speakers to discuss different teaching methodologies and offers parent training on an "as-needed basis," for instance if "parents want to know about more specific methodologies or programs." (Tr. at 195:5-196:6.) Cruz explained that parent training can be done individually or in groups and that the school offers transportation and babysitting services to ensure that parents are able to participate in training opportunities. (*Id.* at 233:15-234:12.) As the SRO's conclusion is supported by the record and plaintiffs have not offered any evidence to the contrary, the Court affirms the SRO's determination. *See M.N.*, 700 F. Supp. 2d at 368 (finding that failure to include parent training and counseling on a child's IEP did not result in denial of FAPE given that defendant's proposed placement provided parent training); *K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ.*, 07 Civ. 3199, 2008 U.S. Dist. LEXIS 89827, at *20-21 (E.D.N.Y. July 2, 2008) (same), *aff'd*, 584 F.3d 412 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 3277 (2010).

b. Transition Plan

Plaintiffs maintain that the DOE should have created a "transition plan" for Z.-L. due to her "special needs," but fail to specify why a transition plan was necessary. As the SRO found, there is no requirement in the IDEA for a "transition plan" when a student moves from one school to another. *See Robert B. v. W. Chester Area Sch. Dist.*, 04 Civ. 2069, 2005 U.S. Dist. LEXIS 21558, at *25 (E.D. Pa. Sept. 27, 2005). Rather, the IDEA requires such a plan

16

where a student will be transitioning from school to post-school (i.e., adult) activities, *see* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb); 34 C.F.R. § 300.43(a), a situation inapplicable to this action.

Here, the SRO found that although a "transition plan"—as defined in the IDEA—was unnecessary, Z.-L.'s IEP should have included specified services to assist her in transitioning from the Rebecca School to the Children's Workshop School. However, the SRO concluded that the DOE's failure to do so did not result in the denial of a FAPE because such support services "would have been discussed and the [Children's Workshop School] would have been responsive in addressing any transition needs related to her enrollment at the school." (SRO Decision at 16.) In support of his determination, the SRO cited the testimony of Cruz, who stated that the Children's Workshop School (1) evaluates incoming students using a Brigance Assessment in order to get a "benchmark of where the kids are" before beginning instruction, (2) communicates with students' prior teachers and their parents, and (3) develops transition plans for new students. (Tr. at 191:16-193:17.) According due deference to the SRO, the Court agrees with the SRO's determination that the DOE was not required to create a "transition plan" for Z.-L. and that the DOE's failure to identify services in Z.-L.'s IEP related to her transition from the Rebecca School to the Children's Workshop did not result in the denial of a FAPE. *See T.P. & S.P.*, 554 F.3d at 254 (district courts required to "defer appropriately to the decisions of the administrative experts on . . . how best to transition an autistic child" from home-based educational program to school-based program).

Because the Court finds that Z.-L.'s IEP was neither procedurally flawed nor substantively deficient, it does not reach the issues of whether private placement at the Rebecca School was appropriate or whether equitable considerations affect relief.

17

C. <u>The DOE's Counterclaims for Recoupment of Payments</u>

The DOE seeks reimbursement for payments it has already made to plaintiffs for Z.-L.'s Rebecca School tuition and transportation costs and for her after-school services. With exceptions not relevant here, the IDEA's stay-put provision provides that "during the pendency of [IDEA] proceedings" the child "shall remain in [his or her] then-current educational placement . . . until all such proceedings have been completed." 20 U.S.C. § 1415(j). Section 1415(j) represents "Congress' policy choice that all handicapped children, *regardless of whether their case is meritorious or not*, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Mackey v. Bd. of Educ.*, 386 F.3d 158, 160-61 (2d Cir. 2004) (emphasis in original) (citation omitted).

If the student's "current educational placement" is in private school, "the responsibility for private school tuition 'stays put' as well." *M.M. v. N.Y. City Dep't of Educ.*, 09 Civ. 52386, 2010 U.S. Dist. LEXIS 75127, at *6-7 (S.D.N.Y. July 27, 2010) (citing *N.Y. City Dep't of Educ. v. S.S.*, 09 Civ. 810, 2010 U.S. Dist. LEXIS 25133, at *18 (S.D.N.Y. Mar. 17, 2010)). Thus, where, as here, the school district has been paying for a child's private school tuition, it must continue to do so until the moment when the child's educational placement changes. The DOE does not dispute that Z.-L.'s current educational placement consists of tuition and transportation costs at the Rebecca School plus 20 hours of "Floortime" therapy. It also acknowledges that it was required to make the payments at issue pursuant to the IDEA's stay-put provision.

However, defendant asserts that because it provided Z.-L. with a FAPE for the 2008-2009 school year, equitable principles under the IDEA and common law require that the parents now reimburse the school district for these outlays. However, the DOE fails to cite, nor has this Court found, any case in which parents were directed to reimburse a school

18

district for payments that the school district made to the parents while their IEP challenge was pending. This is unsurprising given that both binding and non-binding case law is to the contrary. *See generally S.S.*, 2010 U.S. Dist. LEXIS 25133; *see also Mackey*, 386 F.3d at 165-66; *C.G. & L.G. v. N.Y. City Dep't of Educ.*, 09 Civ. 6169, 2010 U.S. Dist. LEXIS 114435, at *14 (S.D.N.Y. Oct. 22, 2010); *Arlington Cent. Sch. Dist. v. L.P.*, 421 F. Supp. 2d 692, 700-03 (S.D.N.Y. 2006). Additionally, because the IDEA preempts state law, the DOE cannot recoup payments it has made to plaintiffs via a claim it has asserted for unjust enrichment. *See S.S.*, 2010 U.S. Dist. LEXIS 25133 at *6. Accordingly, the DOE's motion for summary judgment on its counterclaims for return of the payments it has made to plaintiffs is denied.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is denied; defendant's motion for summary judgment is granted insofar as it seeks dismissal of the complaint and denied insofar as it requests recovery of the payments it has already made to plaintiffs.

Dated: New York, New York
       January 24, 2011

SO ORDERED:

Sidney H. Stein, U.S.D.J.